**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| RANDER J. DUNN-JOHNSON, | § | |
|     **Plaintiff,** | § | |
| v. | § | No. 3:10-CV-1826-BF |
| | § | |
| COMMISSIONER OF THE | § | |
| SOCIAL SECURITY ADMINISTRATION, | § | |
|     **Defendant.** | § | |

## MEMORANDUM OPINION AND ORDER

This is an appeal from the decision of the Commissioner of the Social Security Administration ("Commissioner") denying the claim of Rander J. Dunn-Johnson ("Plaintiff") for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act"). The Court considered Plaintiff's Brief, Defendant's Brief, Plaintiff's Reply Brief, and Defendant's Surreply Brief. The Court reviewed the record in connection with the pleadings. The final decision of the Commissioner is affirmed.

## Background[1]

## Procedural History

Plaintiff protectively filed an application for DIB on February 1, 2008, alleging disability since January 15, 2008, due to heart problems. (Tr. 100-103, 123.) The Commissioner denied her application administratively, and pursuant to Plaintiff's request, an Administrative Law Judge ("ALJ") conducted a hearing on April 16, 2009. Plaintiff and a vocational expert ("VE") testified. (Tr. 6-28.)

---

[1] The following background facts are taken from the transcript of the administrative proceedings, which is designated as "Tr."

The ALJ found that Plaintiff could perform her past relevant work as a mail clerk, file clerk, and photocopy machine operator.  (Tr. 37, Finding 6.)  Accordingly, the ALJ found Plaintiff not disabled from January 15, 2008 through September 30, 2009, the date of the decision.  (Tr. 38, Finding 7.)

On July 15, 2010, the Appeals Council denied Plaintiff's request for review of the ALJ's decision.  (Tr. 1-5.)  Accordingly, the ALJ's decision became the Commissioner's final administrative decision for purposes of judicial review.  (Tr. 38.)

### Plaintiff's Age, Education, and Work Experience

Plaintiff was born on February 2, 1952 and was 55 years old on her alleged onset date of January 15, 2008. (Tr. 100.) She has therefore been a "person of advanced age" at all times relevant to this action. *See* 20 C.F.R. § 404.1563(3).  Plaintiff is a high school graduate and does not have any other vocational or technical training.  Most recently, Plaintiff worked as a grocery receiver clerk at Minyard's.  The VE identified the position as "medium" and "skilled" work.[2] (Tr. 24.)  Previously, she worked as a nurse/caregiver from June of 2001 through May of 2006.  Plaintiff was a mail clerk from August of 2001 through June of 2003.  She also performed clerical work for Imprimis Staffing from October 2000 - October 2001, for American Electric Power from November 1993 - October 2000, and for Capital Realty Group from October 1986 - March 1992.  (Tr. 133-140.)  The VE identified Plaintiff's other past relevant work as ranging from medium and semi-skilled through light and unskilled.  (Tr. 24.)

---

[2]*See* 20 C.F.R. §§ 404.1567 (defining "medium" work) and 404.1568 (defining "skilled" work).

**Plaintiff's Medical Evidence**

Plaintiff's disability stems from a heart condition that required her to undergo triple by-pass surgery.  On December 19, 2007, Plaintiff complained of headaches, chest pain, and difficulty breathing to her family physician, Dr. Hanhdung T. Nguyen, D.O.  (Tr. 289-90.)  She told Dr. Nguyen that she was under some stress because she had been working a lot. (*Id.*)  Dr. Nguyen referred her to a heart specialist. (*Id.*)  On January 8, 2008, Plaintiff went to Dr. Jay V. Wright, D.O., at Heart Place. (Tr. 224.)  Plaintiff gave a history of episodes of chest discomfort for approximately two months. (*Id.*) Plaintiff described her symptoms as a pressure sensation in her mid-lower chest lasting up to two minutes and occurring once or twice a week.  Dr. Wright's impression was "Chronic Combined Systolic/Diastolic Heart Failure.  This condition has worsened." (Tr. 226.) Exercise stress test results at the time showed "symptoms consistent with angina pectoris," "marked ischemic changes on ECG with exercise," and suggested a "high probability of significant coronary artery disease." (Tr. 227.)  An echocardiogram performed the same day revealed a dilated left ventricular chamber with mild hypokinesis and "moderate to severe mitral regurgitation (does not look to be rheumatic)." (Tr. 246.)

Based on the results of her tests, Plaintiff underwent coronary bypass surgery on January 15, 2008. (Tr. 253-54.)  She went into postoperative cardiac arrest and experienced blood clots, for which she underwent surgery the next day. (Tr. 256.)  During a postoperative evaluation on February 26, 2008, her doctors pronounced her stable and believed she could return to work by April of that year. (Tr. 250.)  After the surgery, her left ventricular ejection fraction was 35-40% (Tr. 252), compared to 60-65% on January 8, 2008. (Tr. 246.)  Plaintiff reported to Dr. Nguyen on February 29, 2008 that she was getting tired more easily. (Tr. 288.)

3

On March 25, 2008, Plaintiff complained of shortness of breath triggered by walking short distances and said she experienced neuropathic pain over her sternum. (Tr. 325.) Her examining physician was "concerned about her symptoms of shortness of breath on minimal exertion" and believed she "may need further cardiac workup to make sure that she doesn't have ischemia or any new development with her mitral valve." (*Id*.)

At Plaintiff's follow-up appointment on April 1, 2008, Plaintiff complained of chest discomfort to Dr. Wright, describing her chest discomfort as "moderately severe" and located midchest, occurring daily, and worsening with movement and deep breath. (Tr. 328.) Dr. Wright's cardiac examination found the point of maximal impulse was normal, as were her primary heart sounds ("S1" and "S2"); she had no extra heart sounds or murmers. (Tr. 328-30.) Dr. Wright diagnosed her chest pain as possibly coronary ischemia or possibly musculoskeletal. (*Id*.)

Plaintiff's shortness of breath had improved by April 22, 2008 after she had started exercising and walking a longer distance. (Tr. 321.) Dr. Hoang noted Plaintiff's "status post coronary artery bypass surgery and mitral valve repair, stating her "recent echocardiogram and stress test indicate that her cardiac position is good." (*Id*.) "Clinically, her symptoms were much improved." (*Id*.) In a medical report dated September 17, 2008, Plaintiff reported that her doctor released her to go back to work, but that she was afraid she might damage something if she did. (Tr. 350.)

Plaintiff became depressed when her niece died of cancer. (*Id*.) Plaintiff went to Dallas Metrocare where she was diagnosed with and treated for Major Depressive Disorder ("MDD"). (Tr. 348-480.) She reported that she had no hospitalizations for depression but thought she might have had a depressive episode in the past when her grandfather died. (*Id*. 350.) On August 25, 2008, psychiatric records show that although her functioning had been lower recently, it had improved, and

4

Dr. Faris assessed her Global Assessment of Functioning ("GAF") at 60.[3]  Plaintiff showed

improvement with treatment and the Celexa that was prescribed for her.  (Tr. 410, 474, 462.)  The

ALJ found that her depression was not a severe impairment.  (Tr. 34.)

## The Hearing

Plaintiff's hearing took place on April 16, 2009.  Plaintiff was represented by counsel.

Plaintiff and a vocational expert ("VE") testified at the hearing.

## Plaintiff's Testimony

Plaintiff testified that she lives in a second floor apartment home that is similar to a

condominium.  (Tr. 10.)  Her cousin and her cousin's grandson, age 21, live with her.  (*Id*.)  She

testified that her last day of work was January 7, 2008.  (*Id*.)  She said she has not worked since her

bypass surgery because she is tired and has pain in her chest.  (*Id*. 16.)  She said she went to Dallas

Metrocare because of her depression and anxiety.  (*Id*. 17.)  Plaintiff stated that she smokes and that

she drinks socially.  (*Id*. 18.)  Plaintiff testified about her past relevant work.  (*Id*.)  Plaintiff also

revealed that she was collecting unemployment and that she had represented to the unemployment

agency that she was willing to work and that she was, in fact, looking for work.  (*Id*.)  She admitted

that her representations were not true.  (*Id*. 19-20.)  She said she attends church, and she attempts to

walk for exercise, but tires easily.  (*Id*. 22.)  She testified that she has a car.  (*Id*. 23.)  Additionally,

she said that she has a friend she talks to on the telephone.  (*Id*.)

---

[3]  The GAF is a subjective determination based on a scale of 100 to 1 of "the clinician's judgment
of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and
Statistical Manual of Mental Disorders (Text Revision 4th ed. 2000) ("DSM-IV-TR") at 32. A GAF
score of 51-60 indicates "moderate symptoms," such as a flat affect, or "moderate difficulty in social
or occupational functioning." *Id.* at 34.

## The VE's Testimony

The VE testified to Plaintiff's past relevant work with the required exertional and skill levels. (*Id.* 24.)  The VE stated that an individual who could lift or carry 20 pounds occasionally, 10 pounds frequently, sit for six hours per day; stand or walk six hours per day; who could never climb ladders or ropes; and who occasionally could use ramps and stairs could perform Plaintiff's past work as a mail clerk (light, unskilled, SVP two); file clerk (light; semi-skilled, SVP three); and  photocopy machine operator (light, unskilled, SVP two).  (*Id.* 24.)  She testified that such an individual would not have any skills that would transfer to sedentary work.  (*Id.*)  The VE further testified that her testimony was consistent with the Dictionary of Occupational Titles ("DOT").  (*Id.* 25.)

## The ALJ's Decision

The ALJ utilized the five-step sequential evaluation process to find Plaintiff not disabled under the Act.  (Tr. 32-38.)  *See* 20 C.F.R. § 404.1520(a)(4) (2010).[4]  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of January 15, 2008.  (Tr. 34, Finding 2.)  At step two, the ALJ found that Plaintiff had the following "severe" impairment: history of coronary artery bypass graph.  (Tr. 34, Finding 3.)  At step three, the ALJ found Plaintiff did not have an impairment or combination of impairments that met or medically equaled an Appendix 1 listed impairment for presumptive disability under the regulations.  (Tr. 34, Finding 4.)  Next, the ALJ determined that Plaintiff's subjective complaints were not fully credible. (Tr. 35-37.)

---

[4]The five steps are: (1) Is the claimant performing substantial gainful activity? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or equal a listed impairment? (4) Does the impairment prevent the claimant from doing past relevant work? (5) Does the impairment prevent the claimant from doing any other work?  20 C.F.R. § 404.1520(a)(4).

The ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform light work,[5] with additional limitations.  (Tr. 35, Finding 5.)  Specifically, the ALJ found Plaintiff could lift and carry a maximum of 20 pounds occasionally and 10 pounds frequently; stand and walk about six hours in an eight-hour workday; and sit about six hours in an eight-hour workday.  (Tr. 35, Finding 5.)  Additionally, the ALJ limited Plaintiff to not climbing ladders, ropes, or scaffolds; and occasionally using ramps and stairs.  (Tr. 35, Finding 5.)

At step four, the ALJ found that Plaintiff could perform her past relevant work as a mail clerk, file clerk, and photocopy machine operator.  (Tr. 37, Finding 6.)  Accordingly, the ALJ found Plaintiff not disabled from January 15, 2008, through September 30, 2009, the date of his decision. (Tr. 38, Finding 7.)

## Standard of Review

To be entitled to social security benefits, a plaintiff must prove that she is disabled for purposes of the Social Security Act. *Leggett v. Chater*, 67 F.3d 558, 563–64 (5th Cir. 1995); *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988).  The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled.  Those steps are:

---

[5]Light work involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  20 C.F.R. § 404.1567(b).

1.   An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.   An individual who does not have a "severe impairment" will not be found to be disabled.

3.   An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.   If an individual is capable of performing the work the individual has done in the past, a finding of "not disabled" must be made.

5.   If an individual's impairment precludes her from performing her past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the inquiry, the burden lies with the claimant to prove her disability.

*Leggett*, 67 F.3d at 564.  The inquiry terminates if the Commissioner determines at any point during

the first four steps that the claimant is disabled or is not disabled.  *Id*.  The inquiry terminated at the

fourth step in this case.

The Commissioner's determination is afforded great deference.  *Leggett*, 67 F.3d at 564.

Judicial review of the Commissioner's findings is limited to whether the decision to deny benefits

is supported by substantial evidence and to whether the proper legal standard was utilized.

*Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C.A. § 405(g).  Substantial evidence

is defined as "that which is relevant and sufficient for a reasonable mind to accept as adequate to

support a conclusion; it must be more than a scintilla, but it need not be a preponderance."  *Leggett*,

67 F.3d at 564.  The reviewing court does not reweigh the evidence, retry the issues, or substitute its

own judgment, but rather scrutinizes the record to determine whether substantial evidence is present.

*Greenspan*, 38 F.3d at 236.  However, "[t]he ALJ's decision must stand or fall with the reasons set

8

forth in the ALJ's decision, as adopted by the Appeals Council." *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000). Moreover, the terms of 20 C.F.R. § 404.1527 define "medical opinions" and instruct claimants how the Commissioner will consider the opinions.[6] In the Fifth Circuit, "the opinion of the treating physician who is familiar with the claimant's impairments, treatments and responses, should be accorded great weight in determining disability." *Newton*, 209 F.3d 448, 455 (5th Cir. 2000); *see Floyd v. Bowen,* 833 F.2d 529, 531 (5th Cir.1987).

### Issues

The following issues are taken verbatim from Plaintiff's opening brief:

1.    Whether the ALJ erred by failing to conduct a proper step three analysis.

      a.    Whether the ALJ failed to conduct a proper step three determination of whether Plaintiff's chronic heart failure met the listing; and

      b.    Whether the ALJ erred by failing to call a Medical Expert to testify as to whether Plaintiff's chronic heart failure medically equaled a listing.

2.    Whether the ALJ committed reversible error by failing to consult a Medical Expert with respect to the issue of onset and medical improvement, in violation of SSR 83-20.

---

[6] The terms of 20 C.F.R. § 404.1527(a)(2) provide:

(2) Evidence that you submit or that we obtain may contain medical opinions. Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.

## Analysis

Plaintiff claims that the ALJ erred by failing to conduct a proper step three analysis, claiming broadly that the ALJ must determine whether the claimant meets or medically equals a Listing and specifically that the ALJ failed to conduct a proper step three determination of the claimant's chronic heart failure.  Plaintiff claims that her chronic heart failure meets the listing and believes that at least two listings are implicated, specifically, §§ 4.02 and 4.04.  When Plaintiff claimed for the first time in her reply brief that the ALJ should have called a medical expert to testify that her heart impairment equaled the listing at § 303(b), the Court granted the Commissioner leave to file a Sur-Reply.  The Commissioner contends that (1) substantial evidence supports the ALJ's finding that Plaintiff did not equal an Appendix 1 Listed Impairment, specifically §§ 4.02 and 4.04; (2) the ALJ did not err by not calling a medical expert to testify as to whether Plaintiff's impairment equaled Listing § 3.03(B); and (3) the absence of testimony by a medical expert does not constitute reversible error.

## Plaintiff's Claim that the ALJ Committed Reversible Legal Error at  Step Three

At step three of the sequential evaluation process, the ALJ must determine whether a claimant has an impairment or combination of impairments that meets or equals a condition outlined in the listing. *See* 20 C.F.R. § 404.1520(d). An impairment matches a listing if it meets all of the specified medical criteria. *Sullivan v. Zebley,* 493 U.S. 521, 530 (1990).  An impairment that manifests only some of the criteria, no matter how severely, does not qualify.   *Sullivan,* 493 U.S. at 530.  An unlisted impairment or combination of impairments is equivalent to a listed impairment if medical findings are present which equal in severity all of the criteria for the one most similar listed

impairment. [7]  *Sullivan,* 493 U.S. at 531; *see* 20 C.F.R. § 404.1526; SSR 83–19 (impairment is "equivalent" to a listing only if claimant's symptoms, signs, and laboratory findings are "at least equivalent in severity" to the criteria for the listed impairment most like claimant's impairment).  A determination of medical equivalence must rest on objective medical evidence.  20 C.F.R. § 404.1529(d)(3) ("[a] finding of equivalence must be based on medical evidence only").

If a claimant's impairment is in the Listing of Impairments or is found to be equivalent to a listed impairment, this raises the presumption of disability that makes further inquiry into work ability unnecessary.  *See Sullivan*, 493 U.S. at 531.  The Fifth Circuit has declined to impose "formalistic rules" regarding the contents of an administrative decision.  *See Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir.1994) (declining to require that ALJ specify the evidence supporting a credibility finding and discuss the evidence that was rejected).  Nevertheless, the Fifth Circuit Court of Appeals has held that

---

[7] Under Social Security regulations, medical equivalence can be found in three ways:

(1) If you have an impairment that is described in [the Listing of Impairments] ... but [¶] ... [y]ou do not exhibit one or more of the findings specified in the particular listing, or [¶] ... [y]ou exhibit all of the findings, but one or more of the findings is not as severe as specified in the particular listing, [¶] ... [w]e will find that your impairment is medically equivalent to that listing if you have other findings related to your impairment that are at least of equal medical significance to the required criteria.

(2) If you have an impairment(s) that is not described in [the Listing of Impairments] ..., we will compare your findings with those for closely analogous listed impairments. If the findings related to your impairment(s) are at least of equal medical significance to those of a listed impairment, we will find that your impairment(s) is medically equivalent to the analogous listing.

(3) If you have a combination of impairments, no one of which meets a listing ..., we will compare your findings with those for closely analogous listed impairments. If the findings related to your impairments are at least of equal medical significance to those of a listed impairment, we will find that your combination of impairments is medically equivalent to that listing.

20 C.F.R. § 404.1526(b).

11

the ALJ is required to discuss the evidence and state the reasons for an adverse determination at Step Three. *Audler v. Astrue,* 501 F.3d 446, 448 (5th Cir. 2007). The Fifth Circuit concluded that a summary conclusion that a claimant fails to meet or equal the criteria of an unspecified listing is insufficient because it does not permit meaningful judicial review. *Id.*

In this case, the ALJ stated that he had considered all of Plaintiff's impairments and concluded that "[t]he claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526). (*Tr.* 34.) The ALJ did not identify any listed impairment for which Plaintiff's symptoms fail to qualify, nor did he provide any explanation as to how he reached the conclusion that Plaintiff's symptoms are insufficiently severe to meet any listed impairment, other than the conclusory statement that none of Plaintiff's treating physicians, examining physician, or the state agency medical personnel indicated that Plaintiff's medical conditions, singularly or in combination met or equaled any listing. (*Id.* 35.) The ALJ's Step Three analysis is legal error under *Audler.* However, the Court is not required to remand a case for legal error unless a claimant's substantial rights have been affected. *Id.; Mays v. Bowen,* 837 F.2d 1362, 1364 (1988).

The listings under 4.00 Cardiovascular System pertain to cardiovascular impairments such as the one which caused Plaintiff to undergo bypass surgery and mitral valve repair. A cardiovascular impairment means "any disorder that affects the proper functioning of the heart or the circulatory system (that is, arteries, veins, capillaries, and the lymphatic drainage)." The listings under 4.00 describe cardiovascular impairments based on symptoms, signs, laboratory findings, response to a regimen of prescribed treatment, and functional limitations. Under 4.00, "persistent means that the

longitudinal clinical record shows that, with few exceptions, the required finding(s) has been present, or is expected to be present, for a continuous period of at least 12 months, such that a pattern of continuing severity is established; recurrent means that the longitudinal clinical record shows that, within a consecutive 12–month period, the finding(s) occurs at least three times, with intervening periods of improvement of sufficient duration that it is clear that separate events are involved; . . . [and] a consecutive 12–month period means a period of 12 consecutive months, all or part of which must occur within the period we are considering in connection with an application or continuing disability review."

Plaintiff contends that listings 4.02 and 4.04 are "implicated" and the ALJ should have at least addressed the listing in 4.02. To meet the criteria for Chronic Heart Failure, a claimant must show the requirements in both A and B are satisfied:

A. Medically documented presence of one of the following:

1. Systolic failure (see 4.00D1a(I)), with left ventricular end diastolic dimensions greater than 6.0 cm or ejection fraction of 30 percent or less during a period of stability (not during an episode of acute heart failure); or

2. Diastolic failure (see 4.00D1a(ii)), with left ventricular posterior wall plus sepal thickness totaling 2.5 cm or greater on imaging, with an enlarged left atrium greater than or equal to 4.5 cm, with normal or elevated ejection fraction during a period of stability (not during an episode of acute heart failure);

AND

B. Resulting in one of the following:

1. Persistent symptoms of heart failure which very seriously limit the ability to independently initiate, sustain, or complete activities of daily living in an individual for whom an MC, preferably one experienced in the care of patients with cardiovascular disease, has concluded that the performance of an exercise test would present a significant risk to the individual; or

2. Three or more separate episodes of acute congestive heart failure within a consecutive 12–month period (see 4.00A3e), with evidence of fluid retention (see 4.00D2b(ii)) from clinical and imaging assessments at the time of the episodes,

13

requiring acute extended physician intervention such as hospitalization or
emergency room treatment for 12 hours or more, separated by periods of
stabilization (see 4.00D4c); or

3. Inability to perform on an exercise tolerance test at a workload equivalent to 5
Mets or less due to:

a. Dyspnea, fatigue, palpitations, or chest discomfort; or

b. Three or more consecutive premature ventricular contractions (ventricular
tachycardia), or increasing frequency of ventricular ectopy with at least 6
premature ventricular contractions per minute; or

c. Decrease of 10 mm Hg or more in systolic pressure below the baseline systolic
blood pressure or the preceding systolic pressure measured during exercise (see
4.00D4d) due to left ventricular dysfunction, despite an increase in workload; or

d. Signs attributable to inadequate cerebral perfusion, such as ataxic gait or mental
confusion.

20 CFR Pt. 404, Subpt. P, App. 1.  Plaintiff has the burden of proof at step three of the sequential

evaluation process.  *See Greenspan*, 38 F.3d at 236.  She has not pointed to any evidence which she

claims meets the A and B requirements of the listing.  Moreover, she has not pointed to evidence

which shows that she meets the requirements of any other cardiovascular impairment.  The only

evidence she cites to in this regard is a test which shows her left ventricular ejection fraction was 35-

40% six weeks after her surgery.  (Tr.  252.)  However, the test itself is not persuasive proof that she

met a listing.  Dr.  Wright, the heart specialist who reviewed the test, found that: (1) Plaintiff's CAD,

Native Vessel condition remained stable; (2) there was no evidence of mitral regurgitation since the

mitral valve repair; (3) the Chronic Combined Systolic/Diastolic Heart Failure condition remained

stable, and (4) the status Post Coronary Artery Bypass Graft condition remained stable.  (Tr.  284.)

He stated, "she may  return to work on 4/6/08."  (*Id*.)

The ALJ's decision shows that after a careful review of all of Plaintiff's medical evidence of

her impairments, the ALJ discussed Plaintiff's history of coronary artery bypass graph ("CABG")

14

and mitral valve repair that had occurred on January 15, 2008. (Tr.  34; 36-37.) The ALJ also considered Plaintiff's follow up appointments after her surgery.  (*Id*.)  On March 25, 2008, Plaintiff still had shortness of breath walking short distances and neuropathic pain over the sternum, but she did not have angina.  (*Id*. 325.)  Otherwise, she was doing relatively well.  (*Id*.)  On April 1, 2008, Plaintiff was examined for chest discomfort, moderate, severe with sharp pain at midchest.  (*Id*. 228-31.)  She reported daily and constant chest pain which was worse with movement and deep breathing.  (*Id*. 328.)  The doctor noted that Plaintiff had not stopped smoking.  (*Id*.)  The doctor diagnosed chest pain syndrome.  (*Id*.)  Her physical exam showed no syncope, no paroxysmal nocturnal dyspnea ("PND"), normal heart sounds with no gallop nor murmurs, but positive for palpitation and chest pain.  (*Id*.)  In an exam on April 22, 2008, a repeat echo was performed with EF 45-50% and a normal ventricular function.  (*Id*. 321-22.)   The treating cardiologist found her symptoms were much improved.  (*Id*.)  She was able to walk longer distances and her physical examination was normal. (*Id*.)  In a medical report dated September 17, 2008, it was noted that Plaintiff's doctor released her to return back to work but she didn't want to work because she was worried she might damage something.  (*Id*.)

On May 7, 2009, Plaintiff denied chest pain or any other associated complaints.  (*Id*. 466-480.)   She was stable.  With respect to her hypertension, she had no complaints and denied any side effects of her medication.  (*Id*.)  With regard to her hyperlipidemia, she was in compliance with treatment and that was reported as "excellent."  (*Id*.)  She exercised intermittently and said that she felt well and had no symptoms of cardiovascular disease.  (*Id*.)  She specifically denied chest pain, palpitations, dyspnea, shortness of breath, PND, claudication, and peripheral edema.  (*Id*.)  She also denied any side effects with her medications.  (*Id*.)  This evidence, cited by the ALJ in determining

Plaintiff's residual functional capacity, shows that Plaintiff failed to meet her burden to show that she met listing 4.02 or 4.04.   Substantial evidence discussed by the ALJ supports his decision that Plaintiff's impairment did not meet or equal any listing.   The Court finds that the ALJ's failure to meet the *Audler* requirements at Step Three was harmless error, and reversal and remand based upon this legal error is not required.

**Plaintiff's Claim that the ALJ Erred by Not
Considering that her Impairment Equaled Listing 3.03(B)**

Plaintiff claims that the ALJ erred by not finding that her impairments equaled listing 3.03(B). Plaintiff fails to explain how listing 3.03 (B) which pertains to asthma, an impairment Plaintiff never even claimed, could equal a listing for a cardiac surgical procedure.   The regulations are clear that an impairment is "equivalent" to a listing only if claimant's symptoms, signs, and laboratory findings are "at least equivalent in severity" to the criteria *for the listed impairment most like claimant's impairment*."   To show equivalence, a claimant must present medical findings equal in severity to all the criteria *for the one most similar listed impairment*.   *See Zebley*, 493 U.S. 521 (1990)(emphasis supplied).   Plaintiff makes the conclusory allegation that because the days in 2008 in which she was either hospitalized or seeking physician intervention for her heart problems exceed the criteria for severity set forth in listing 3.03(b) for asthma, her heart problems equaled listing 3.03(b). None of the treatments or hospitalizations Plaintiff relies upon pertain to an exacerbation of asthma, cystic fibrosis, bronchiectasis (a lung condition), or chronic asthmatic bronchitis, as required under the regulations.   *See* § 3.00(C).   The regulations make clear that "chronic heart failure" is considered in these listings as a single category whether due to atherosclerosis (narrowing of the arteries), cardiomyopathy(a disease of the heart muscle), hypertension, or rheumatic, congenital, or other heart

disease. Only if the chronic heart failure results from primary pulmonary hypertension secondary to disease of the lung will a claimant's impairment be evaluated using 3.09 in the respiratory system listings in part A. 20 CFR Pt. 404, Subpt. P, App. 1. The record is devoid of evidence that Plaintiff's atherosclerosis is the result of primary pulmonary hypertension secondary to disease of the lung. Plaintiff's claim that the ALJ erred by failing to consider listing 3.03 (b) is entirely without merit because Plaintiff's one most similar listed impairment in this case is listing 4.02 for chronic heart failure. Plaintiff's claim that the ALJ erred by not calling a medical expert to testify as to whether her impairments equaled listing 3.03(b) is also without merit.

### The ALJ's Failure to Call a Medical Expert to Infer an Onset Date

On February 1, 2008, the claimant protectively filed a Title II application for a period of disability and disability insurance benefits, alleging an onset date of January 12, 2008. (Tr. 100.) Plaintiff, who was represented by counsel, never sought to amend and never amended her alleged onset date. The ALJ found that Plaintiff met the insured status requirements of the Act through December 31, 2011, that she had not engaged in substantial gainful activity since the alleged onset date of January 15, 2008, that she had a severe impairment of "history of coronary artery bypass graph, that she did not meet a listing, and that she had the residual functional capacity to perform her past relevant work as a mail clerk, file clerk, and photocopy machine operator. The ALJ concluded that Plaintiff had not been under a disability under the Act from January 15, 2008 though September 30, 2009, the date of the decision.

At her hearing before the ALJ, Plaintiff's counsel never raised any issue with respect to Plaintiff's alleged onset date and never asked any questions relative to the onset date. Plaintiff raised the issue for the first time before the Appeals Council, claiming that the ALJ committed reversible

legal error by failing to call a medical expert to testify regarding Plaintiff's onset date. The Appeals Council denied review. Plaintiff now claims that the ALJ raised the issue of inferences regarding onset and a potential closed period due to medical improvement by "invoking Plaintiff's inexact date of onset"[8] and her doctor's September 2008 note releasing her to work. Plaintiff also claims that the ALJ committed reversible error by failing to call a medical expert to infer that Plaintiff's onset date occurred earlier than she alleged.[9] The Commissioner argues that the ALJ did not commit reversible legal error in either of these respects and that the ALJ was not required to call a medical expert because there was no issue of an inferred onset date or of a potential closed period of disability in this case.

Plaintiff contends the Fifth Circuit Court of Appeals has held in multiple cases that Social Security Ruling ("SSR") 83-20 is applicable even in cases where the ALJ has found that a claimant is not disabled, citing *Ivy v. Sullivan*, 898 F.2d 1045 (5th Cir. 1990); *Smith v. Chater*, 68 F.3d 471 (5th Cir. 1995); and *Spellman v. Chater*, 68 F.3d 357 (5th Cir. 1993). The Commissioner distinguishes each of these cases. For example, *Ivy v. Sullivan* involved a case of lost medical records whereas this case includes medical evidence from the time of the alleged onset date. *See Ivy*, 898 F.2d at 1046. In *Smith v. Chater*, the appellate court did not need to address the applicability because it found that the claimant had waived the argument. *See Smith*, 68 F. 3d at 471. Finally, *Spellman* involved a case where the medical evidence with regard to the onset date of Spellman's

---

[8] Plaintiff alleges that the ALJ invoked the issue of an inference regarding onset when, in discussing Plaintiff's medical history in connection with his determination of Plaintiff's RFC, the ALJ stated that "the claimant has had symptoms of angina on exertion and dyspnea on exertion since Thanksgiving [of 2007]."

[9] Plaintiff claimed she stopped work on January 7, 2008, because she went into the hospital for tests (Tr. 10.)

disability was ambiguous because it was unclear when Spellman's mental impairment first restricted her functional capacity. *See Spellman*, 1 F.3d at 363. At the administrative level, Spellman's onset date was found to be well after the date she stopped working, whereas Spellman claimed her onset date to be the date she stopped working. The Fifth Circuit remanded the district court's judgment in part for the Commissioner to redetermine the onset date using a medical advisor. *See id*.

In this case, the Court need not determine the effect, if any, of a finding of "not disabled" on Plaintiff's argument.[10] This case does not involve ambiguous medical evidence, an ambiguous date of work stoppage, or any need for the ALJ to infer a different onset date rather than the date Plaintiff alleged. Substantial evidence supports Plaintiff's alleged onset date of January 15, 2008.

Under SSR 83-20, the onset date should be set on the date when it is most reasonable to conclude that the claimant's impairment was severe enough to cause the inability to engage in

---

[10] In cases arguing that the ALJ erred by failing to infer an onset date pursuant to SSR 83-20, some courts have held that the regulation does not apply unless the ALJ first finds that the claimant is disabled. *See, e.g., Sides v. Astrue*, 2011 WL 5037221 (W.D.N.C. July 12, 2011) citing *Greer v. Apfel*, 205 F.3d 1333 (table), 2000 WL 139241, at *1 (4th Cir.2000) (affirming ALJ's decision, which found that the claimant was not disabled and held that SSR 83–20 was inapplicable); *King v. Astrue*, No. 3:09–cv–493–RJC–DCK, 2010 WL 4977067, at *4 (W.D.N.C. Nov. 8, 2010, *aff'd* 2010 WL 4975483) (rejecting the plaintiff's argument based on SSR 83–20 because "the ALJ found that Plaintiff was not disabled, and therefore was under no obligation to determine an onset date of disability") *See also Klawinski v. Comm'r of Soc. Sec.*, 391 F. App'x 772, 776 (11th Cir. 2010) ("the ALJ did not contravene SSR 83–20 because the ALJ ultimately found that Klawinski was not disabled, and SSR 83–20 only required the ALJ to obtain a medical expert in certain instances to determine a disability onset date after a finding of disability"); *Blair–Bain v. Astrue*, 356 F. App'x 85, 88 (9th Cir. 2009) ("Because the ALJ found that Blair–Bain was not disabled prior to the last date insured, we have no cause to remand under SSR 83–20."); *Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997) ("Since there was no finding that the claimant is disabled as a result of his mental impairment or any other impairments or combination thereof, no inquiry into onset date is required."); *Eichstadt v. Astrue*, 534 F.3d 663, 667 (7th Cir. 2008) ("The Commissioner reads SSR 83–20 as urging the ALJ to seek a medical examiner's opinion only after a finding of disability has been made. We give some deference to the Commissioner's interpretations, and we find this one to be entirely reasonable.").

substantial gainful activity for at least twelve months.  SSR 83–20.  The onset date is critical, and "it is essential that the onset date be correctly established and supported by the evidence."  *Id.*  In addition to the claimant's allegation of the onset date, other factors relevant to the determination of the onset date include the claimant's work history and the medical evidence.  *Id.*

A claimant's alleged onset date is the starting point for determining an onset date.  *Nolen v. Sullivan,* 939 F.2d 516, 519 (7th Cir.1991).  The critical date is the actual onset of the impairment, not the date of diagnosis. *See Lichter v. Bowen,* 814 F.2d 430, 435 (7th Cir.1987). The governing regulation provides that the date alleged "should be used if it is consistent with all the evidence available."  SSR 83–20.  The claimant's alleged onset date and the date of work stoppage must be consistent with the severity of the condition shown by the medical evidence.  *Id.*  That date is adjusted by considering the claimant's work history, and may be adjusted further in light of medical evidence describing examinations or treatment of the claimant.  *Id.*  Medical evidence is "the primary element in the onset determination."  *Id.*  If medical evidence does not establish the date the impairment became disabling, the ALJ should seek a medical expert for assistance.  *Id.*

 In choosing the onset date,  Plaintiff alleged that on January 15, 2008, she became unable to work because of her medical condition.  (Tr.  119, 123.)  Accordingly the starting point in this case is January 15, 2008, Plaintiff's alleged onset date which is the date Plaintiff underwent triple bypass surgery and mitral valve repair.  No adjustment due to work history is required because Plaintiff did not engage in any substantial gainful activity after she went into the hospital for heart tests.  (*Id.*; Tr. 10.)  The record does not show that Plaintiff suffered absences from work or quit work at the time her medical histories indicate the first symptoms of her heart condition appeared.  In fact, when

Plaintiff first sought medical treatment for the chest pains, she told her treating physician that she had been working a lot.  (Tr.  289.)

In addition to Plaintiff's work history, Plaintiff's medical history is also consistent with her alleged onset date of January 14, 2008. When Plaintiff went to her primary physician, Dr. Nguyen, on December 19, 2007, she had not reported any chest pains or other symptoms of heart trouble to any medical provider.  (Tr.  290-319.)  She told Dr Nguyen she woke up with chest pains that morning and had similar pain a week before.  (Tr.  289.)  After performing tests, Dr. Nguyen referred Plaintiff to Dr. Wright, a heart specialist; Dr. Wright examined Plaintiff on January 8, 2008.  (Tr. 224.)  Plaintiff described the chest discomfort as a "pressure sensation moderate in severity, located mid lower chest."  (*Id*.)  The tests indicated that surgery would be required.  (*Id*.)  Plaintiff was admitted to the hospital on January 13, 2008, and the surgery was performed on January 15, 2008. (*Id*.)

A claimant's alleged onset date "should be used if it is consistent with all the evidence available."  S.S.R. 83–20.  The ALJ had no need for the services of a medical expert as Plaintiff contends because the ALJ had a relatively complete medical chronology of Plaintiff's heart condition from December 19, 2007, through the date of the decision.  In this case, Plaintiff's alleged onset date is consistent with all the evidence submitted. Given these facts and the lack of work stoppage or medical evidence to support a different date, the ALJ did not commit reversible error by failing to call a medical expert to infer a different onset date.  Plaintiff has shown no prejudice from the ALJ's determination of Plaintiff's onset date as the date Plaintiff alleged, January 15, 2008.  Nor has Plaintiff otherwise shown that the ALJ's finding is not supported by substantial evidence.  Nevertheless, even if the ALJ erred in finding that Plaintiff's onset date was the date Plaintiff (who

was represented by counsel) alleged, the error is harmless.  The ALJ considered all the evidence, and the ALJ's decision to deny disability, including the finding that Plaintiff has not been under a disability from January 15, 2008 through the date of decision is supported by substantial evidence.

## **CONCLUSION**

The Commissioner's decision is supported by substantial evidence and any legal error is harmless.  Accordingly, the Commissioner's decision is **AFFIRMED**.

Signed, March 22, 2012.


PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE